## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

**CIVIL ACTION NO: 4:19-CV-00166-JHM**

**JACOB CLARK, et al.**                                                    **PLAINTIFFS**

**V.**

**BERNDAETTE STONE, et al.**                                          **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motions for Judgment on the Pleadings, or in the Alternative, for Summary Judgment. [DN 23; DN 27]. Fully briefed, these matters are ripe for decision. For the following reasons, the Defendants' Motions are **GRANTED**.

### I.     BACKGROUND

Plaintiffs Jacob and Genetta Clark, for themselves and as Next Friend and Guardian of H.C., a minor (collectively, the "Plaintiffs"), sued Bernadette Stone, Catherine Campbell, and Douglas Hazelwood in both their official and individual capacities. [DN 1]. Additionally, Plaintiffs sued Marcus Haycraft and Adam Meier, succeeded by Eric Friedlander, in their official capacities. Plaintiffs allege they were deprived of their First, Fourth, Fifth, and Fourteenth Amendment rights by the Defendants in relation to an investigation by the Kentucky Cabinet for Health and Family Services ("CHFS") into suspected abuse of the Clark children. [DN 1 ¶ 2].

Jacob and Genetta Clark have three children together—C.C., age 16; N.C., age 14; and H.C., age 12. [DN 1 ¶ 3]. According to the Complaint, in December 2018, Mr. and Ms. Clark were experiencing disciplinary issues with their son, N.C., that extended to his behavior at school. [*Id.* ¶ 18]. His parents warned that if his conduct did not change, there would be consequences. [*Id.*]. In mid-December, the family was at home and Ms. Clark was helping N.C. treat his acne. At some point, N.C. became upset, stood up, and slammed the door in his mother's face. [*Id.* ¶

22].  When Ms. Clark opened the door, N.C. began using threatening body language.  [*Id.*].  Ms. Clark, concerned that N.C. was going to strike her, struck N.C. twice on his rear end with a wooden back scratcher.  [*Id.*].  When N.C.'s behavior did not improve, Mr. Clark struck N.C. five or six times across his rear end with a belt.  [*Id.* ¶ 23].  N.C., attempting to avoid the strikes, pushed his arm down, and his arm was struck by the belt.  [*Id.*].  N.C.'s older brother, C.C., who attempted to intervene to stop his parents, was thereafter disciplined with the belt.  [*Id.* ¶ 24].

The Complaint states that the next morning, N.C. apologized to his parents and acknowledged that the disciplinary measures taken were overdue given his outbursts.  [*Id.* ¶ 25].  C.C., though, made a report to his school.  The following day, Ms. Stone, a social worker from the CHFS, received information regarding the incident.  [*Id.* ¶ 27].  Ms. Stone instructed the school staff to remove the children from their classrooms for interviews.  [*Id.* ¶ 30].  According to the Complaint, the children were asked whether they were safe at home and whether they were being abused.  [*Id.* ¶ 32].  During the interview, Ms. Stone noticed a red mark on N.C.'s arm which was photographed.  [*Id.* ¶ 31].  Defendants dispute Plaintiffs' claim that the red mark on N.C.'s arm was the only basis for Ms. Stone pursuing an investigation in this case.  [DN 10 at 2 n.4].  Defendants' Motion states that "C.C. also reported that his mother Genetta Clark punched him in his face and hit him in the crotch with a backscratcher."  [*Id.*].

Following the interviews with the Clark children, on December 17, 2018, Ms. Stone contacted Mr. Clark.  [DN 1 ¶ 39].  Mr. Clark informed Ms. Stone that his religious beliefs instruct him to reasonably discipline the children and that corporal punishment is used only when necessary.  [*Id.*].  Ms. Stone directed Mr. Clark to bring his children into the CHFS to discuss the issue and to enter a prevention plan.  [*Id.* ¶ 40].  Mr. Clark declined and said he would not do so unless required by court order.  [*Id.* ¶ 41].  That same day, Ms. Stone filed three neglect/abuse

cases in the District Court of Grayson County, Kentucky.  [*Id.* ¶ 46].  The Plaintiffs claim there was no legal or factual basis for the cases filed by Ms. Stone because Kentucky law permits reasonable and ordinary discipline recognized in the community where the child resides.  [*Id.* ¶ 49].  Further, Plaintiffs claim that Ms. Stone knowingly made false statements in completing her investigation.  [*Id.* ¶ 50].

The case was first heard by a court on December 19, 2018.  [*Id.* ¶ 53].  Plaintiffs allege they were given notice of the hearing only minutes before it was set to begin and thus were unable to attend.  [*Id.*].  The Plaintiffs claim Ms. Stone perjured herself at the hearing, which resulted in a court order that Mr. and Ms. Clark were not to use physical discipline on the children and were to cooperate with the CHFS.  [*Id.* ¶¶ 56–57].  On January 9, 2019, a judge ordered Mr. and Ms. Clark to permit home visits according to Ms. Stone and her co-workers' wishes.  [*Id.* ¶ 58].  Mr. Clark objected, claiming a Fourth Amendment right for a warrant to be issued before a search. The judge informed Mr. Clark that he did not have a Fourth Amendment right when CHFS was involved and that if the Clarks did not cooperate, he would remove the children from their home. [*Id.*].  Plaintiffs maintain that they have Fourth Amendment rights even when the CHFS is involved.  [*Id.* ¶ 59].

On January 28, 2019, Ms. Stone and Ms. Campbell, along with a sergeant from the sheriff's office, came to the Clark's home.  [*Id.* ¶ 60].  Mr. Clark posted the text of the Fourth Amendment to the home's front door and then videotaped the entire interaction with Ms. Stone and Ms. Campbell.  [*Id.* ¶¶ 61–62].  Mr. Clark objected to the visitors' entry but eventually allowed them in and said he was doing so under duress and coercion.  [*Id.* ¶ 63].  On January 30, 2019, another hearing was held.  Plaintiffs allege that at this hearing Ms. Stone explained to the judge that the Clarks were not cooperating because of Mr. Clark's use of the video camera.

3

Plaintiffs allege this constitutes retaliation for the assertion of their First and Fourth Amendment rights.  [*Id.* ¶ 66].  There was another home visit and another hearing before Plaintiffs' claim the CHFS terminated its investigation of the Clarks.  Plaintiffs allege that on August 1, 2019, the claims against the Clarks were dismissed with prejudice upon finding the claims baseless.  [*Id.* ¶ 73].  During the over seven-month pendency of the CHFS's investigation, the Clarks were ordered to cooperate with the CHFS and to not physically discipline their children.  [*Id.* ¶ 74].  The Clark parents maintain that this order caused substantial interference with their ability to direct the education and upbringing of their children.

Plaintiffs filed their complaint on November 20, 2019.  [DN 1].  Therein, they sought prospective declaratory and injunctive relief against the official capacity defendants based on a claim they feared engaging in reasonable corporal punishment of their children.  [*Id.* ¶ 79].  Additionally, Plaintiffs sued Ms. Stone, Ms. Campbell, and Mr. Hazelwood for several individual capacity claims.  Specifically, Plaintiffs sued the three individual capacity defendants for two First Amendment violations [*Id.* ¶¶ 82–84], two Fourth Amendment violations [*Id.* ¶¶ 85–87], a Fourteenth Amendment substantive due process violation [*Id.* ¶ 80], and a state law malicious prosecution claim [*Id.* ¶¶ 102–110].  Plaintiffs also sued Ms. Stone for a Fourteenth Amendment procedural due process violation.  [*Id.* ¶ 81].  All five defendants previously moved to dismiss the official capacity claims against them—specifically, the claims for declaratory and injunctive relief.  [DN 10].  The Court granted the defendants' motion.  [DN 34].  The three remaining individual capacity defendants now move for judgment on the pleadings, or in the alternative, for summary judgment on all remaining claims.  [DN 23; DN 27].  Plaintiffs filed a joint response to Defendants' motions [DN 38] and Defendants filed a joint reply [DN 40].

## II.    STANDARD OF REVIEW

We must first determine whether to review Defendants' motions under FED. R. CIV. P. 56 or FED. R. CIV. P. 12(c).  Rule 12(c) states that "after the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."  Such a motion is analyzed under the same standard as a motion to dismiss.  However, both Plaintiffs and Defendants have attached and referred to documents outside of the pleadings.  Specifically, Plaintiffs submit a declaration of their daughter, H.C. [DN 36], portions of the juvenile court record [DN 37], a declaration of their attorney, Christopher Wiest [DN 38-1], a declaration of father, Mr. Clark [DN 38-2], and a declaration of a former CHFS employee, Tina Moore [DN 38-3].  Defendants submit the CHFS's standards of practice [DN 23-3], an affidavit of Assistant Grayson County Attorney, Sidney Durham [DN 23-4], an affidavit of retired Grayson County District Court Judge, Shan Embry [DN 23-5], a DVD of the state court hearings [DN 24; DN 25], CHFS records [DN 26-1–DN 26-13], color photos of N.C.'s wounds [DN 26-14], two newspaper articles pertaining to child abuse in Kentucky [DN 27-2; DN 27-3], redacted domestic violence records related to Mr. and Ms. Clark [DN 27-4], and a pediatrics study focused on children exposed to corporal punishment [DN 27-5].

Federal Rule of Civil Procedure 12(c) requires a court to convert a motion for judgment on the pleadings to a motion for summary judgment where "matters outside the pleadings are presented to and not excluded by the court."  Documents attached to a Rule 12 motion are considered part of the pleadings if they are referred to in the complaint and are central to the plaintiffs' claims.  *See Weiner v. Klais & Co.*, 108 F.3d 86, 88–89 (6th Cir. 1997).  If a court chooses to treat a Rule 12(c) motion as a motion for summary judgment under Rule 56, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  FED. R. CIV. P. 12(d).  The decision of whether to consider evidence beyond the

pleadings and convert a motion for judgment on the pleadings into one for summary judgment is committed to the discretion of the Court. *See Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 931 (6th Cir. 2000).

Taking into consideration the early stage of this litigation, the Court does not believe it to be prudent to convert the motion to one for summary judgment. This is so in spite of the fact that Plaintiffs also submitted documents not attached to their pleadings. That said, the Court finds that the CHFS records, the color photos of N.C.'s wounds, and the DVD containing video recordings of the juvenile court hearings may be considered without converting the motion to a motion for summary judgment. These exhibits pertain to the underlying abuse cases. Without the underlying abuse cases, Plaintiffs would have no claims. Accordingly, the Court declines to convert the instant Motion to a motion for summary judgment but instead will rule on the Motion for Judgment on the Pleadings.

The standard of review for a Rule 12(c) motion for judgment on the pleadings "is the same as for a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (citations omitted); FED. R. CIV. P. 12(b)(6); FED. R. CIV. P. 12(c). Under Rule 12(b), a court "must construe the complaint in the light most favorable to plaintiffs," *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted), "accept all well-pled factual allegations as true," *Id.*, and determine whether the "complaint . . . states a plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Under this standard, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff satisfies this standard only when it "pleads factual content that

6

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  A complaint falls short if it pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679.  Instead, "a complaint must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* at 663 (quoting Fed. R. Civ. P. 8(a)(2)).  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III.   DISCUSSION

At the core of Plaintiffs' suit are 42 U.S.C. § 1983 claims alleging violations of the First and Fourth Amendments, as well as the Fourteenth Amendment's Due Process Clause.  To state a claim under § 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Doe v. Miami Univ.*, 882 F.3d 579, 595 (6th Cir. 2018).  Even if a plaintiff sufficiently pleads a § 1983 claim against a government official in their personal capacity, if raised, there is an additional hurdle a plaintiff must overcome—qualified immunity.  *Dominquez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).  Additionally, Defendants assert absolute immunity for certain conduct.  Though the Court does not consider the absolute immunity issue dispositive of any of the claims, Defendants' reliance on it warrants discussion.  The Court begins with an overview of absolute immunity, proceeds to consider three claims under a qualified immunity analysis, and then addresses Plaintiffs' four remaining claims.

### A.  Absolute Immunity

Defendants first contend that Plaintiffs' claims are barred by absolute prosecutorial immunity.  [DN 23 at 1; DN 27 at 2].  Indeed, social workers do enjoy a form of absolute immunity, though the immunity applies only in certain contexts.  "[S]ocial workers are absolutely immune only when they are acting in their capacity as *legal advocates*—initiating court actions or testifying under oath—not when they are performing administrative, investigative, or other functions."  *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc) (emphasis in original).  "The official seeking absolute immunity bears the burden of showing that immunity is justified in light of the function she was performing."  *Id.* at 774.  "When applied, [t]he defense of absolute immunity provides a shield from liability for acts performed erroneously, even if alleged to have been done maliciously or corruptly."  *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 694 (6th Cir. 2013) (alteration in original) (internal quotation marks omitted).

As explained by the Sixth Circuit in *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, absolute immunity based on a prosecutorial function covers social workers' interactions with a court, such as "testimony or recommendations given in court concerning the child's best interests as she saw the matter."  640 F.3d 716, 725 (6th Cir. 2011) (internal quotation marks omitted).  Additionally, "[s]ocial workers who initiate judicial proceedings against those suspected of child abuse or neglect perform a prosecutorial duty, and so are entitled to absolute immunity."  *Rippy v. Hattaway*, 270 F.3d 416, 421 (6th Cir. 2001).

This being the case, some of Defendants' actions are shielded by absolute immunity. Filing the complaint concerning child abuse on December 19, 2018, which initiated the formal court proceedings, is "clearly prosecutorial in nature under this standard and thus protected by absolute immunity."  *Kovacic*, 724 F.3d at 694.  Similarly, preparing the statement in support of

8

the abuse petitions at the direction of Assistant County Attorney Sidney Durham was prosecutorial in nature and is thus also protected by absolute immunity. *Id.* Finally, any testimony by Defendants under oath is also protected by the shield of absolute immunity.

Again, each of Plaintiffs' claims warrants dismissal on separate grounds as discussed herein. But, to the extent that any claim is premised upon Defendants' above conduct—the filing of the three abuse petitions, the preparation of the statement in support thereof, and testimony under oath—the Defendants are entitled to absolute immunity.

### B. Qualified Immunity

When a defendant invokes qualified immunity, it is the plaintiff's burden to show: (1) the defendant's acts violated a constitutional right and (2) the right was clearly established at the time of the defendant's alleged misconduct. *Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015). Although courts have discretion to determine which prong of the qualified immunity analysis should be addressed first, when faced with this defense at the pleading stage, the inquiry should be confined to the "clearly established" prong if possible. *Id.* at 844–45.

For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 845 (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)). When determining whether a right is clearly established, courts are instructed to consider the "specific context of the case" and to avoid construing rights too generally. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012). Once the right at issue is properly defined, the Court determines whether a right is clearly defined by examining cases from the Supreme Court, the Sixth Circuit, and other circuits. *Barber*, 809 F.3d at 845 (quoting *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012)). Defendants are entitled to

qualified immunity on three of Plaintiffs' claims.  The Court addresses each of those claims in turn.

### 1.   First Amendment – Retaliation Towards Recording

Plaintiffs allege that Defendants retaliated against them for exercising their right to video and audio record Defendants during the home visits.  [DN 1 ¶¶ 83–84].  Defendants respond that Plaintiffs assert a non-existent right to videotape social workers during home visits and argue that none of Plaintiffs' case law supports such a claim.  [DN 23-1 at 18–21].  Defendants further claim the chain of causation between their actions and the continued abuse cases was broken by the juvenile court judge's finding of probable cause at each stage.  [*Id.* at 20–21].

"In general, retaliation claims involve a plaintiff engaged in conduct protected by the Constitution or by statute and a defendant who takes an adverse action against the plaintiff based, at least in part, on plaintiff's protected conduct."  *Cohen v. Smith*, 58 F. App'x 139, 143 (6th Cir. 2003) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 386–87 (6th Cir. 1999) (en banc)).  To be specific, to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) they were engaged in protected conduct; (2) an adverse action was taken against them that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Blatter*, 175 F.3d at 396–98.  As to the last prong, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

"In inquiring whether a constitutional right is clearly established, [the Court] must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our

circuit, and finally to decisions of other circuits.'"  *Walton v. City of Southfield*, 995 F.2d 1331,

1336 (6th Cir. 1993) (quoting *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir.1991), *cert.*

*denied*, 502 U.S. 1060 (1992)).

Plaintiffs cite to several cases from different circuit courts in support of their claim that

they had an "absolute First Amendment right to video and audio record" Defendants.  [DN 1 ¶

83 (citing *Glik v. Cuniffe*, 655 F.3d 78 (1st Cir. 2011); *Gericke v. Begin*, 753 F.3d 1 (1st Cir.

2014); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3rd Cir. 2017); *Turner v. Lieutenant*

*Driver*, 848 F.3d 678, 688–90 (5th Cir. 2017); *ACLU v. Alvarez*, 679 F.3d 583, 595–96, 599–600

(7th Cir. 2012); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Smith v. City of*

*Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Crawford v. Geiger*, 131 F. Supp. 3d 703, 714–

15 (N.D. Ohio 2015)].  Defendants, in turn, cite cases within our circuit which have found that

the right to video record is not clearly established.  [DN 23-1 at 19 n.45 (citing *Williams v. City*

*of Paris*, 5:15-CV-108-DCR, 2016 WL 2354230, at \*4 (E.D. Ky. May 4, 2016); *Davis-Bey v.*

*City of Warren*, 16-CV-11707, 2018 WL 895394, at \*6 (E.D. Mich. Jan. 16, 2018)].  The

existence of conflicting caselaw suggests that an absolute right to video record is not clearly

established.

Moreover, the *Crawford* case cited by Plaintiffs stands for a contrary position than that

which Plaintiffs wish.  In 2014, the Northern District of Ohio found "there is a First Amendment

right to openly film police officers carrying out their duties."  *Crawford v. Geiger (Crawford I)*,

996 F. Supp. 2d 603, 615 (N.D. Ohio 2014).  But, a year later, the *Crawford* court conducted a

more thorough analysis of the relevant case law and reversed itself on this issue.  *See Crawford*

*v. Geiger (Crawford II)*, 131 F. Supp. 3d 703, 715 (N.D. Ohio 2015) ("On further consideration

in connection with the instant motions, however, I believe the right openly to film police carrying

out their duties is not so clear cut that it is proper in this case to withhold qualified immunity as to the First Amendment claim.").

Even more tellingly, the cases cited by the parties consider the issue of whether the First Amendment encompasses a right to film *police officers* carrying out their duties, not social workers. As abovementioned, for a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Barber v. Miller*, 809 F.3d 840, 845 (6th Cir. 2015) (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)). When determining whether a right is clearly established, a court must consider the "specific context of the case" and avoid construing rights too generally. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012). Plaintiffs have not pointed to any cases establishing a First Amendment right to videotape social workers during an in-home visit and the Court is not aware of any such case in this circuit. Based on the absence of cases establishing such a right, as well as the unsettled state of the law in the Sixth Circuit concerning a First Amendment right to video record police officers, it is reasonable to conclude that the right Plaintiffs' seek to invoke is not clearly established. Accordingly, Defendants' Motions are **GRANTED** as to this claim.

## 2. Fourth Amendment – Unconstitutional Home Searches Without a Warrant

Plaintiffs next allege their Fourth Amendment rights were violated when Defendants entered their home without a warrant and without consent or exigency. [DN 1 ¶¶ 86–87]. The Court, relying on the Complaint, has identified three dates on which the Defendants came to Plaintiffs' residence and requested entrance—Ms. Stone and Ms. Campbell on January 28, 2019, Mr. Hazelwood on February 25, 2019, and Mr. Hazelwood again on May 28, 2019. [*Id.* ¶¶ 60–

64, 69, 71].  Defendants assert those events do not violate the Fourth Amendment because they were conducted pursuant to Judge Goff's order which, they argue, is tantamount to a warrant. [DN 23-1 at 20–21; DN 27-1 at 8, 18–19].

The Fourth Amendment protects against unreasonable searches and seizures.  U.S. CONST. amend IV.  The Supreme Court has noted that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ."  *United States v. United States Dist. Ct.*, 407 U.S. 297, 313 (1972).  That being the case, "searches and seizures inside a home without a warrant are presumptively unreasonable[.]"  *Groh v. Ramirez*, 540 U.S. 551, 559 (2004).  Thus, a warrantless search or seizure inside a home by a law enforcement officer violates the Fourth Amendment unless an exception to the warrant requirement applies. See *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  In 2012, the Sixth Circuit conclusively stated that a "social worker, like other state officers, is governed by the Fourth Amendment's warrant requirement." *Andrew v. Hickman Cnty.*, 700 F.3d 845, 859 (6th Cir. 2012).  That being the case, the court explained that social workers "would have to obtain consent, have sufficient grounds to believe that exigent circumstances exist, or qualify under another recognized exception to the warrant requirement before engaging in warrantless entries and searches of homes."  *Id.* at 859–60.  The *Andrews* court also noted, however, that many contours of the right were not clearly established. *Id.* at 862.  For example, the next year, the Sixth Circuit refused to extend "clearly established" status to the Fourth Amendment right not to have a social worker enter a home without a warrant. *Kovacic v. Cuyahoga Cnty. Dep't of Children and Family Servs.*, 724 F.3d 687, 699 (6th Cir. 2013).

Here, the social workers' actions were made pursuant to a court order issued by Grayson County Juvenile Court Judge Shan Embry.  Sidney Durham, an Assistant County Attorney for

13

Grayson County, authorized the defendants to file the abuse petitions in the juvenile court. To be clear, Judge Embry's order falls well short of a valid warrant. To be valid under the Fourth Amendment, a warrant must be issued by a neutral and detached magistrate, be supported by probable cause, and it must meet a particularity requirement—which requires the warrant to particularly describe the place to be searched or the things or persons to be seized. *United States v. Beals*, 698 F.3d 248, 264 (6th Cir. 2012). The orders related to the three children do not contain any facts supporting probable cause. [DN 26-11 at 19–20 JV 19–20; DN 26-12 at 19–20 JV 77–78; DN 26-13 at 20–21 JV 46–47]. The facts included in Ms. Stone's statement in support of the cases are not included in the order. Additionally, the order lacks particularity—it merely requires the parents to "cooperate and actively participate in treatment or a social service program." *Id.* To be sure, at a hearing on January 9, 2019, Judge Kenneth Goff explained Judge Embry's order to cooperate. [Video of Jan. 9, 2019, Court Hearing]. In response to Plaintiffs' complaint that the order to "cooperate" was vague, Judge Goff explained that it meant they must permit the social workers access to their home. *Id.* Judge Goff expressly stated that two social workers would be out to the Plaintiffs' home before the next court hearing set for January 30, 2019. *Id.* Despite Judge Goff's explanation, the order clearly has deficiencies. That being the case, it is unlikely that either Judge Embry or Judge Goff intended for the order to serve as a valid warrant. Thus, the Court finds that any actions taken pursuant to the order were warrantless.

The question thus becomes whether a reasonable social worker would understand they were violating the Fourth Amendment based on these facts. This case is not the first time a court in the Sixth Circuit has considered this factual scenario. In *Barnett v. Hommrich*, No. 3:17-CV-155, 2018 WL 10195923 (E.D. Tenn. March 27, 2018), a district court in the Eastern District of Tennessee addressed a very similar situation. There, a juvenile court judge

14

issued a written order requiring that the parents allow the social workers entrance to their home. *Id.* at \*4.  That court found that a reasonable social worker armed with a court order would not have realized that entering a home and searching it without a warrant violated the Fourth Amendment.  *Id.* at \*5.  The *Barnett* decision relied on the law's complexity concerning administrative searches.  *Id.* (citing *Hall v. Sweet*, 666 F. App'x 469, 479 (6th Cir. 2016) (holding an administrative search into a children's care home without a warrant did not violate a clearly established right)).  Further, the court noted that such a conclusion was "bolstered by the Sixth Circuit's repeated refusal to recognize that it is clearly established that social workers need a search warrant before entering a home."  *Id.* (citing *Andrews v. Hickman Cnty.*, 700 F.3d 845, 859–60 (6th Cir. 2012); *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 698–700 (6th Cir. 2013)).

The Court finds persuasive the Eastern District of Tennessee's analysis and conclusion. Based on the above reasoning, the Court finds that it was not clearly established that a social worker entering a home and searching it based on a non-warrant court order violates the Fourth Amendment.  Accordingly, Defendants are entitled to qualified immunity on this claim. Defendants' Motions are **GRANTED** as to this claim.

### 3. Fourteenth Amendment Violation – Substantive Due Process

Finally, in the qualified immunity analysis, Plaintiffs claim that the defendants violated their Fourteenth Amendment due process rights by depriving them of their parental liberty interest.  Plaintiffs assert that the "no discipline order" from the Grayson County juvenile court constituted an interference with their right to reasonably parent their children.  [DN 1 ¶ 80; DN 38 at 18–19].  Plaintiffs argue that their right to use corporal punishment to discipline their children is a right clearly established under the Fourteenth Amendment.  *Id.*  Defendants respond

that such a right is not clearly established as neither the Supreme Court nor the Sixth Circuit have ever held that parents have a constitutional right to use corporal punishment.  [DN 23-1 at 16; DN 27-1 at 18].

For clarity's sake, it is important to nail down the exact right Plaintiffs are asserting. KRS § 503.110 provides that parents may use physical force on their children if they believe "the force used is necessary to promote the welfare of a minor" and "[t]he force that is used is not designed to cause or known to create a substantial risk of causing death, serious physical injury, disfigurement, extreme pain, or extreme mental distress."  Kentucky regulations place a limitation on parents' ability to use physical punishment.  922 KAR 1:330 is an administrative regulation concerning child protective services.  It provides that the CHFS shall "investigate or conduct an assessment upon the receipt of a report of physical abuse if the report alleges . . . [a]n injury that is, or has been, observed on a child that was allegedly inflicted nonaccidentally by a caretaker." 922 KAR 1:330(2)(4)(a)(1).  The same regulation provides a non-exhaustive list of criteria that are used in identifying reports of abuse that do *not* require a child protective services investigation or assessment.  922 KAR 1:330(2)(5).  If a report concerns "corporal punishment appropriate to the age of the child, *without* an injury, mark, bruise, or substantial risk of harm," that must be used to identify when an investigation is not necessary.  922 KAR 1:330(2)(5)(f).  That being the case, the Plaintiffs are essentially claiming that they have a right to use corporal punishment on their children even if the force used causes injury, marks, bruises, or substantial risk of harm. Now that the asserted right is properly understood, the Court can turn to whether Defendants are liable for the alleged violation of this right.

The Sixth Circuit has previously described substantive due process claims as coming in two varieties: "(1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock

the conscience.'"  *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997)).  However, more recently, the Sixth Circuit has articulated the standard differently. The court has explained that when reviewing a substantive due process claim, "we first ask whether the plaintiff has shown 'a deprivation of a constitutionally protected liberty interest' and then ask whether 'the government's discretionary conduct that deprived that interest was constitutionally repugnant.'"  *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 765–66 (6th Cir. 2020) (citing *Am. Express Travel Related Servs. Co., Inc. v. Kentucky*, 641 F.3d 685, 688 (6th Cir. 2011)).

Defendants first argue they cannot be liable for actions attributable to the juvenile court. [DN 23-1 at 7–12; DN 27-1 at 15–16].  Defendants essentially argue that to the extent that Plaintiffs suffered a deprivation of a fundamental right—which they contest—that deprivation was perpetrated by the juvenile court, not by Defendants.  Sixth Circuit case law confirms as much.  In *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, the Sixth Circuit found that the defendant social workers were merely a party to the juvenile court proceeding, tasked with investigating the circumstances of a given case and presenting to the juvenile court their recommendations as to the appropriate course of action.  640 F.3d at 728–29.  Because the juvenile court has the ultimate decision-making authority with respect to Plaintiffs' ability to use corporal punishment, it alone could deprive Plaintiffs of a fundamental right.  *Id.*; *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 809 F. Supp. 2d 754, 781–82 (N.D. Ohio 2011), *aff'd*, 724 F.3d 687 (6th Cir. 2013).

The Sixth Circuit has recognized an exception to the general rule that the issuing court alone is responsible for the deprivation of a fundamental liberty interest—"there is an exception

17

for when the court order is based on a bad-faith child-services investigation." *Heithcock v. Tenn. Dep't of Children's Servs.*, 2016 U.S. App. LEXIS 24392, at *11 (6th Cir. Oct. 4, 2016). Plaintiffs allege that Defendants pursued the abuse cases in bad faith.  [DN 1 ¶¶ 43–45]. However, Defendants also assert that they are entitled to qualified immunity on this claim. Because of the allegation of bad faith, Defendants may be liable if there is in fact a Fourteenth Amendment violation.  That being the case, it is necessary to consider whether Plaintiffs asserted a claim for a clearly established protected liberty interest.

Defendants contend that there is no clearly established right to use corporal punishment to raise, supervise, and discipline children.  [DN 23-1 at 15–17; DN 27-1 at 16–18].  As stated above, "[i]n inquiring whether a constitutional right is clearly established, [the Court] must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'"  *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) (quoting *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir.1991), *cert. denied*, 502 U.S. 1060 (1992)).  Plaintiffs cite six cases in support of the position that there is a clearly established right to reasonably parent one's children—four Supreme Court cases, one case from the Eastern District of Kentucky, and one case from the Seventh Circuit.  [DN 1 ¶ 80; DN 38 at 18–19].

In *Washington v. Glucksberg*, the Supreme Court unanimously held that a right to assisted suicide was not a right protected by the Fourteenth Amendment Due Process Clause.  521 U.S. 702 (1997).  Plaintiffs cite this case for the proposition that the Due Process Clause protects the right to bring up one's children.  [DN 1 ¶ 80].  *Meyer v. Nebraska* and *Pierce v. Society of Sisters*—both relied on by Plaintiffs—support this very general statement.  In *Meyer*, the Supreme Court held that a Nebraska law restricting foreign-language education violated the Due Process

18

Clause.  262 U.S. 390 (1923).  In *Pierce*, the Supreme Court struck down an Oregon law that required all children to attend public school.  268 U.S. 510 (1925).  Next, Plaintiffs cite to *Troxel v. Gainsville*.  530 U.S. 57 (2000).  In *Troxel*, the Supreme Court stated that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."  *Id.* at 66.  In so holding, the Court struck down a Washington law that allowed any person to petition state courts for child visitation rights over parental objections.  *Id.* at 60, 75.  These cases, while establishing a very broad right of parents to make decisions concerning the upbringing of their children, do not clearly establish the right Plaintiffs assert here—the right to use corporal punishment even if such punishment results in marks or bruises on the child.

The Court turns to cases within our circuit.  Plaintiffs cite to *Schulkers v. Kammer* to support their contention that the right they assert is clearly established.  955 F.3d 520 (6th Cir. 2020) *aff'g* 367 F. Supp. 3d 626 (E.D. Ky. 2019).  In *Schulkers*, the Sixth Circuit affirmed a decision of the Eastern District of Kentucky and found that the plaintiffs' substantive due process rights were violated by a prevention plan which limited the mother's ability to decide when and where she would be alone with her children.  The court, recognizing the sacred nature of the family relationship, noted that "it is 'plain beyond the need for multiple citation' that a parent's 'desire for and right to the companionship, care, custody and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection.'"  *Id.* at 540 (quoting *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 27 (1981)).  Though the defendants argued that the interest in family integrity was outweighed by the state's interest in preventing child abuse, the court found that there was no reason to suspect the mother of child abuse at the time the restrictions were put into place.  *Id.*  The case at bar is

distinguishable in a couple ways.  First and foremost, *Schulkers* does not make any mention of a clearly defined right of parents to use corporal punishment to the point of leaving marks or bruises on a child.  Further, in *Schulkers* the court found no reason to suspect child abuse, whereas, here, there was photographic evidence as well as statements from the children that supported Defendants' child abuse petitions.  That evidence was also viewed by Assistant County Attorney Sidney Durham who then authorized the filing of the petitions.

Finally, Plaintiffs cite to a case out of the Seventh Circuit.  [DN 38 at 19 (citing *Doe v. Heck*, 327 F.3d 492, 523 (7th Cir. 2003)].  In *Heck*, the specific right at issue was "the plaintiff parents' liberty interest in directing the upbringing and education of their children includ[ing] the right to discipline them by using reasonable, nonexcessive corporal punishment . . . ."  *Heck*, 327 F.3d at 523.  The court found that the parents had the "right to physically discipline their children, or to delegate that right to private school officials."  *Id.* at 525.  This case's holding is not contrary to Kentucky law.  Indeed, KRS § 503.110 provides that parents may use physical force on their children if they believe "the force used is necessary to promote the welfare of a minor" and "[t]he force that is used is not designed to cause or known to create a substantial risk of causing death, serious physical injury, disfigurement, extreme pain, or extreme mental distress."  That right is merely limited by 922 KAR 1:330.  Again, what *Heck* does not provide, is a statement that the Fourteenth Amendment encompasses the right Plaintiffs assert—the right to use corporal punishment even if that punishment leaves marks on a child.

In the qualified immunity context, when determining whether a right is truly clearly established, a court must consider the "specific context of the case" and avoid construing rights too generally.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012).  The cases cited by Plaintiffs do not address the factual

scenario presented in this case but instead establish a general right of parents to direct the upbringing of their children—a right, which in the Seventh Circuit explicitly encompasses a right to use "reasonable, nonexcessive corporal punishment." *Heck*, 327 F.3d at 523. The Supreme Court has recently stated that to be clearly established, a "rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority[.]'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (*per curiam*); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)). Further, the high Court noted, "[t]he 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the *particular circumstances* before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* at 590 (quoting *Saucier*, 533 U.S. at 202). The cases Plaintiffs cite do not satisfy this high burden. And, the Court is not aware of any other case in this circuit establishing Plaintiffs' claimed right in these circumstances.

The Court need not reach the ultimate issue of whether Plaintiffs in fact have a protected liberty interest in the use of corporal punishment which leaves marks on the subject. It is enough that such a right, even if it does exist in the Sixth Circuit, is not clearly established. Accordingly, Defendants are entitled to qualified immunity on this claim. Defendants' Motion is **GRANTED** as to Plaintiffs' Fourteenth Amendment substantive due process claim.

### C. First Amendment – Hostility Towards Religion

Plaintiffs allege Defendants were hostile in instituting the investigation and then in continuing the child abuse action. [DN 1 ¶¶ 82, 93]. The hostility, Plaintiffs claim, was motivated by a disagreement with Plaintiffs' religious beliefs and thus constitutes a violation of the First Amendment. [*Id.*]. Defendants respond and note that prior to the imitation of the investigation,

they were not aware of Plaintiffs' religious beliefs.  [DN 23-1 at 18].  Defendants argue further that the Free Exercise Clause of the First Amendment does not excuse Plaintiffs from compliance with an otherwise valid law.  [*Id.*].

Plaintiffs' Complaint cites to two cases in support of this claim—one from the Supreme Court and one from the Sixth Circuit.  [DN 1 ¶ 82 (citing *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 543 (1993); *Ward v. Polite*, 667 F.3d 727, 734 (6th Cir. 2012)].  Additionally, in their Response to Defendants' Motions, Plaintiffs claim that Defendants' conduct violated their clearly established rights regarding religious beliefs as set forth in those same two cases.  [DN 38 at 21].  Both cases concern the Free Exercise Clause of the First Amendment.  Accordingly, the Court evaluates Plaintiffs' claim under that framework.

The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. CONST. amend. I.  The Sixth Circuit recently explained that, "[i]n the constitutional context . . . only a law that is not neutral or of general applicability 'must be justified by a compelling governmental interest and must be narrowly tailored to advance than interest.'"  *Doe v. Cong. of the United States*, 891 F.3d 578, 591 (6th Cir. 2018) (quoting *Lukumi*, 508 U.S. at 531–32).  The Supreme Court has held that "neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment."  *Holt v. Hobbs*, 574 U.S. 352, 356–57 (2015) (citing *Emp't Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872, 878–82 (1990)).  "A law is not neutral 'if the object of [the] law is to infringe upon or restrict practices because of their religious motivation,'

or if 'the purpose of [the] law is the suppression of religion or religious conduct.'" *Doe*, 891 F.3d at 591 (quoting *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

Plaintiffs' allegations are severely lacking in terms of asserting a Free Exercise Clause claim. The allegations do not identify the challenged law, nor do they allege that any law was enacted with the specific government intent to infringe upon, restrict, or suppress religious beliefs. The Court presumes the Plaintiffs challenge 922 KAR 1:330(2)(5)(f)—the regulation challenged in their claims for prospective declaratory and injunctive against the official capacity defendants. [DN 1 ¶ 79]. It may be the case that the law incidentally inhibits Plaintiffs' ability to exercise their religion to the extent they desire, but that is not enough to assert a Free Exercise claim. "[T]he incidental effect of suppression is permissible under the Free Exercise Clause absent restrictive intent: The laws must have been 'enacted because of, not merely in spite of their suppression.'" *Doe*, 891 F.3d at 592 (quoting *Lukumi*, 508 U.S. at 541). The regulation at issue is facially neutral. Plaintiffs have not alleged that the regulation was enacted with the intent to suppress any specific religion. Accordingly, Plaintiffs' Complaint fails to state a claim and Defendants' Motions are **GRANTED** as to this claim.

### D. Fourth Amendment – Unlawful Custodial Interview

Plaintiffs initially sued Defendants for Ms. Stone's interview of H.C. at her school. [DN 1 ¶ 85]. However, in their Response to Defendants' Motions, Plaintiffs acknowledge that recent Sixth Circuit case law—specifically *Schulkers v. Kammer*, 955 F.3d 520 (6th Cir. 2020)—renders this claim meritless. In *Schulkers*, the Sixth Circuit found that, although the social workers who conducted in-school interviews of children violated the Fourth Amendment, the law surrounding in-school interviews by social workers was not clearly established. That being the case, the social workers were entitled to qualified immunity. *Id.* at 533–34. Given that the conduct in this case

took place before the Sixth Circuit's 2020 ruling, Plaintiffs voluntarily abandon this aspect of their Fourth Amendment claim.  [DN 38 at 22–23].

### E.  Fourteenth Amendment – Procedural Due Process

As a preliminary matter it is worth noting that this claim, unlike the others discussed herein, is only against Ms. Stone.  Plaintiffs claim their procedural due process rights under the Fourteenth Amendment were violated when Ms. Stone informed Plaintiffs of an imminent hearing mere minutes before it was to take place.  [DN 1 ¶ 81].  Further, Plaintiffs allege Ms. Stone falsely informed the court that Plaintiffs were informed of the hearing and chose not to attend.  [*Id.*].  As a result, Plaintiffs assert they were "unable to respond to the charges at a time and place when their response would likely have forestalled the entire chain of events that followed."  [*Id.*].  Ms. Stone responds that she called Mr. Clark at 11:44 a.m. to tell him about the afternoon juvenile court motion docket, beginning at 1:00 p.m. that same day.  [DN 23-1 at 17].  She states that she could not inform Mr. Clark earlier because the County Attorney only gave approval to file the petitions that morning and Ms. Stone needed time to prepare them.  [*Id.*].  Further, Ms. Stone argues that Plaintiffs' rights were not violated because the hearing "did not result in the loss of any substantive liberty interest."  [*Id.* at 18].

To establish a violation of procedural due process rights, a plaintiff must show "(1) that [they were] deprived of a protected liberty or property interest, and (2) that such deprivation occurred without the requisite due process of law."  *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. Of Shelby, Mich.*, 470 F.3d 286, 296 (6th Cir. 2006) (citing *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002)); *see also Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 809 F. Supp. 2d 754, 775 (N.D. Ohio 2011) ("A Fourteenth Amendment procedural due process claim depends upon the existence of a constitutionally cognizable liberty or property

interest with which the state has interfered."), *aff'd*, 724 F.3d 687 (6th Cir. 2013).  "[D]ue process requires that when a State seeks to terminate [a protected] interest . . . , it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective."  *Bell v. Burson*, 402 U.S. 535, 542 (1971) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

Fatal to Plaintiffs' claim, Defendants were not tasked with notifying them of the hearing in the abuse cases.  In *Pittman*, discussed above, the Sixth Circuit held that the plaintiff's procedural due process claims failed because he argued that the social worker had deprived him of notice and opportunity for a hearing before the juvenile court made child placement decisions. *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 729–30 (6th Cir. 2011).  The court found that under Ohio law it was the juvenile court's duty, and not the duty of the social worker, to give notice to the plaintiff.  *Id.*  Two years later, in *Kolley v. Adult Protective Servs.*, 725 F.3d 581 (6th Cir. 2013), the Sixth Circuit found the same thing with regard to Michigan's law.  Plaintiffs asserted their Fourteenth Amendment rights were violated when the social workers failed to notify them of the custody hearings regarding their child.  *Id.* at 585.  The court held that it was "the Michigan courts' duty to notify the appropriate parties to a custody hearing."  *Id.* at 587 (citing Mich. Comp. Laws Ann. § 330.1614(3)).  As in Michigan and Ohio, it is the Kentucky courts' duty to notify appropriate parties to a dependency, neglect, or abuse action.  KRS § 620.070.  In fact, the Kentucky statute is explicit that employees of the CHFS may *not* properly notify parents of such a hearing.  KRS § 620.070(2).  This being the case, Plaintiffs' procedural due process claim fails and Defendants' Motion is **GRANTED** as to this claim.

**F.  Malicious Prosecution**

Plaintiffs' final claim is a state law claim for malicious prosecution. Plaintiffs allege the defendants maliciously instituted the abuse charges, "knowing that the charges were false, or with reckless disregard for the truth," and that the charges were made with the intent of injuring Plaintiffs. [DN 1 ¶¶ 102–108]. Plaintiffs further allege, in an effort to curb any claim of qualified immunity, that Defendants engaged in bad faith while initiating these child abuse cases. [*Id.* ¶ 109].

The Court has original jurisdiction over Plaintiffs' § 1983 claims. 28 U.S.C. § 1331. Because Plaintiffs' state law malicious prosecution claim arises out of the same incident and shares a common nucleus of operative fact, the Court could exercise its supplemental jurisdiction over the state law claim. 28 U.S.C. § 1367. However, the Court now must consider whether it is prudent to grant such supplemental jurisdiction.

In *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966), the Supreme Court broadly authorized federal courts to assert jurisdiction over state law claims when there existed a "common nucleus of operative fact" compromising "but one constitutional 'case,'" so long as the court had original jurisdiction over at least one claim. *Gibbs*, 383 U.S. at 725. This decision recognized the discretion courts have in hearing such claims: "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over the state claims . . . ." *Id.* at 726. The Court provided scenarios where pendent jurisdiction may be denied: (1) "if the federal claims are dismissed before trial;" (2) if "it appears that the state issues substantially predominate;" or (3) if "the likelihood of jury confusion" would be strong without separation of the claims. *Id.* at 726–27.

Congress later codified the power of a federal court to hear state claims.  28 U.S.C. § 1367.  Similar to the standards articulated in *Gibbs*, the statute recognizes a court's discretion to decline to exercise supplemental jurisdiction if:

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction
(3) the district court has dismissed all claims over which it was original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.*  Subsection three is applicable to the case at bar.

The Sixth Circuit has made clear that "[c]omity to state courts is considered a substantial interest," and therefore, there exists "a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed—retaining residual jurisdiction 'only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [the] concern over needlessly deciding state law issues.'" *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 584 (6th Cir. 2011) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)).

Here, the Court finds that comity favors dismissal.  All federal claims have now been dismissed, and generally "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996).  Plaintiffs' state law malicious prosecution claim is dismissed without prejudice so that Plaintiffs may pursue these claims in a more appropriate forum.  Defendants' Motions are **GRANTED**.

IV.   CONCLUSION

27

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' Motions for Judgment on the Pleadings, or in the Alternative, for Summary Judgment [DN 23; DN 27] are **GRANTED.**

Joseph H. McKinley Jr., Senior Judge

United States District Court

July 28, 2020

cc: counsel of record